## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on May 3, 2018**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No.** |
| **v.** | **Grand Jury Original** |
| **JOHN WOODS,** | **VIOLATIONS:**<br>**Counts 1 through 3: 18 U.S.C. § 1343 (Wire Fraud)** |
| **Defendant.** | **Counts 4 through 7: 18 U.S.C. § 1341 (Mail Fraud)**<br>**Count 8: 18 U.S.C. § 201(b)(1) (Bribery)**<br>**Counts 9 and 10: 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Proceeds from Specified Unlawful Activity)** |
| | **Forfeiture Notice** |

## INDICTMENT

The Grand Jury charges that:

At all times material to this indictment:

## BACKGROUND

1.      Company A was a company that provided various services to federal and state government agencies.  On May 14, 2012, Company A entered into a blanket purchase agreement ("BPA") with the District of Columbia Department of Human Resources ("DCHR"), Workforce Development Administration ("WDA"), to provide organizational skills training courses to various District of Columbia Government ("D.C. Government") agencies.  On May 3, 2013, Company A entered into another BPA with DCHR to provide human resources ("HR") consulting, along with organizational skills training courses.

2.      Defendant JOHN WOODS ("WOODS") was a resident of Sterling, Virginia, and worked as a consultant and independent contractor for Company A.  WOODS taught training courses to D.C. Government employees under the BPAs and managed other contractors who taught such courses.  WOODS also served as Company A's main point-of-contact with DCHR regarding the BPAs.  As that main point-of-contact, WOODS submitted invoices on Company A's behalf to DCHR for payment under the BPAs.

3.      The Center for Technology and Management, LLC ("CTM"), was a Limited Liability Company created by WOODS in the District of Columbia in 2006.  CTM held a business bank account at SunTrust Bank to which WOODS was the sole signatory (the "CTM Account").

4.      Latasha Moore ("Moore") was a D.C. Government employee.  She worked for DCHR from 2002 to 2018.  In 2012, Moore was promoted to the position of Resource Allocation Analyst.

5.      Moore was WOODS's main point-of-contact at DCHR regarding the BPAs.  As part of her official duties at DCHR, Moore received and reviewed the invoices that Company A submitted for payment under the BPAs.  After reviewing those invoices, Moore recommended to her supervisor whether the D.C. Government should pay those invoices, knowing that her supervisor would rely on that recommendation.  On some occasions, Moore would approve those invoices for payment herself.  Moore was also responsible for completing a yearly review of Company A's performance under the BPAs, which DCHR relied upon in determining whether to exercise its yearly option to extend those BPAs.

## COUNTS ONE THROUGH SEVEN
### (Scheme to Defraud – 18 U.S.C. §§ 1341, 1343)

6.      Beginning in or about April 2013, and continuing through in or about August 2017, in the District of Columbia and elsewhere, the defendant, JOHN WOODS devised and intended to

2

devise a scheme and artifice to defraud Company A and the D.C. Government, including DCHR, of money and property.

## Purpose of the Scheme to Defraud

7.     A purpose of the scheme to defraud was for WOODS to enrich himself personally by misappropriating money owed to Company A from the D.C. Government.

## Manner and Means of the Scheme to Defraud

8.     Among the manner and means by which WOODS carried out the scheme to defraud were the following:

a.     WOODS stole checks issued to Company A by taking them from the mail delivered to Company A's office in the District of Columbia, endorsing them in his own name, and depositing them into the CTM Account.

b.     WOODS concealed his theft of checks by misleading Company A into believing that the D.C. Government was negligent in paying Company A for services rendered.

c.     WOODS removed Company A from the billing process and deliberately misinformed Company A that it could no longer provide training services under the BPAs because Company A had lost its Certified Business Enterprise ("CBE") vendor status.

d.     WOODS then usurped the BPAs by secretly performing work under the BPAs himself, submitting invoices to the D.C. Government for that work purportedly on Company A's behalf, obtaining D.C. Government checks written to Company A for those services, and depositing those checks into the CTM Account.

e.     WOODS paid bribes to Moore to be his eyes and ears at DCHR to protect his ability to make money under the BPAs and the scheme to defraud.

        f.      To conceal the scheme to defraud, WOODS led Company A to believe, falsely, that the D.C. Government was negligent and had defaulted on payments it owed Company A, while also, from time to time, depositing money into Company A's bank account that were disguised as D.C. Government payments to protect against Company A escalating action at DCHR to obtain payments Company A believed it was owed.

### Acts in Furtherance of the Scheme to Defraud

**A.**     **WOODS's Theft of D.C. Government Checks Mailed to Company A in 2013**

      9.      Between on or about April 10, 2013, and on or about February 11, 2015, WOODS stole approximately five D.C. Government checks issued to Company A for work performed under the BPAs. The checks totaled approximately $214,910. The checks, which were mailed to Company A's District of Columbia office, were made payable to Company A, and not to WOODS.

      10.      On or about December 23, 2014, Company A's Operations Director ("Person 1") sent WOODS an email asking him to look into why Company A had not received payment from the D.C. Government for certain invoices that Company A submitted. WOODS did not disclose to Company A or Person 1 that Company A's failure to receive those payments was not due to any inaction on the D.C. Government's part, but rather was due to WOODS stealing those checks.

**B.**     **WOODS's Secret Take-Over of the BPAs in March 2015**

      11.      Beginning in or about March 2015, WOODS went from occasionally stealing D.C. Government checks issued to Company A to usurping Company A's role under the BPAs and keeping the profits for himself.

      12.      To accomplish this, WOODS created fraudulent invoices in Company A's name and submitted them to DCHR for payment. At the same time that WOODS submitted these fraudulent invoices, he did not submit Company A's invoices to DCHR for payment. This

eventually led Company A to believe that the D.C. Government was negligent in paying the company's invoices, and Company A stopped seeking to perform work under the BPAs.

13.     WOODS also accomplished this scheme by making numerous payments to Moore. Specifically, the fraudulent invoices that WOODS submitted appeared materially different from the real invoices that Company A submitted previously.  For example, WOODS's invoices lacked a cover letter signed by Company A, which normally accompanied Company A's invoices, were formatted differently from Company A's invoices, and utilized unusual invoice numbers. WOODS's payments to Moore were intended to cause Moore not to question the unusual nature of those invoices.

14.     Before March 2015, WOODS provided Company A with a monthly list of the trainings provided to the D.C. Government for that month under the BPAs.  Contractors providing HR consulting services would then email their timesheets directly to Company A's receptionist, who would give those timesheets to Person 1.  Person 1 would then create an invoice that WOODS provided to Moore for payment from the D.C. Government.  This process changed when, in or about March 2015, WOODS began emailing the invoices directly to Moore, thereby removing Person 1 and Company A from the billing process, thus concealing his fraudulent conduct from Company A.

15.     From in or about March 2015, through in or about August 2017, while WOODS was usurping Company A's role under the BPAs, WOODS fraudulently deposited into the CTM Account approximately 27 checks issued by the D.C. Government to Company A totaling approximately $1,040,023.

C.   **WOODS's Concealment of the Scheme to Defraud by Depositing Money Into Company A's Bank Account Disguised as D.C. Government Payments**

16.   WOODS not only concealed his activities by cutting Company A out from the billing process, but WOODS also deposited money into Company A's bank account to make it appear as if the D.C. Government was actually paying some of Company A's invoices.

17.   Specifically, between on or about September 5, 2014, through on or about November 1, 2016, WOODS deposited approximately seven cashier's checks he purchased into Company A's bank account at Industrial Bank totaling approximately $174,139.27.

18.   To make it appear as if those checks were originating from the D.C. Government, WOODS filled in the purchaser's name on several of those checks as being "DCHR," "CLD", or "CWD." "CLD" and "CWD" referred to "Continuing Learning Development" and "Continuing Workforce Development," respectively, which were programs that Company A supported under the BPAs.

19.   To conceal his scheme further, WOODS never provided Company A with copies of the actual cashier's checks that he deposited into Company A's bank account. Doing so would have revealed that the D.C. Government did not issue those checks but rather that WOODS purchased those checks himself.

### Use of Interstate Wires to Execute the Scheme

20.   On or about the dates listed below, in the District of Columbia and elsewhere, WOODS, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, transmitted and caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals, and sounds; that is WOODS sent emails that crossed interstate into and through the District of Columbia, as follows:

| Count: | Date: | Wire Transmission: |
|---|---|---|
| One | March 25, 2015 | Email from WOODS to Moore attaching an invoice purportedly on Company A's behalf for $13,360. |
| Two | April 27, 2015 | Email from WOODS to Moore attaching an invoice purportedly on Company A's behalf for $24,070. |
| Three | July 28, 2015 | Email from WOODS to Moore attaching three invoices purportedly on Company A's behalf for $14,462, $11,293, and $86,538, respectively. |

All in violation of Title 18, United States Code, Section 1343.

### Use of the Mails to Execute the Scheme

21.     On or about the dates listed below, in the District of Columbia and elsewhere, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, WOODS knowingly took and received from an authorized depository for mail the following matter and things:

| Count: | On or About Date: | Description: |
|---|---|---|
| Four | August 14, 2015 | One check for $111,293 made payable to Company A, mailed to Company A's office in the District of Columbia. |
| Five | October 14, 2015 | One check for $125,000 made payable to Company A, mailed to Company A's office in the District of Columbia. |
| Six | October 7, 2016 | One check for $93,000 made payable to Company A, mailed to Company A's office in the District of Columbia. |
| Seven | June 16, 2017 | One check for $65,000 made payable to Company A, mailed to Company A's office in the District of Columbia. |

All in violation of Title 18, United States Code, Section 1341.

## COUNT EIGHT
### (Bribery – 18 U.S.C. § 201(b)(1))

22.     The allegations set forth in paragraphs 1 through 19 of this Indictment are re-alleged and incorporated by reference.

23.     From in or about July 2014, through in or about August 2017, in the District of Columbia and elsewhere, the defendant, JOHN WOODS, directly and indirectly, corruptly did give, offer, and promise anything of value to a public official with intent to influence an official act, and to induce such public official to do and omit to do an act in violation of the public official's lawful duty; that is, WOODS paid Moore money to influence official action and to induce omissions in violation of lawful duty, which were intended to benefit Company A and WOODS.

### A.     Things of Value

24.     Between on or about July 1, 2014, through on or about August 10, 2017, WOODS paid Moore approximately $140,537.02.

25.     WOODS delivered some of those payments to Moore in person outside of her D.C. Government office.

26.     WOODS paid Moore by checks drawn on the CTM Account and instructed Moore to cash them at a Sun Trust Bank branch in Southwest Washington, D.C., because the employees at the branch there knew him.

### B.     Official Acts and Omissions of Lawful Duty

27.     WOODS paid Moore to influence official action and to induce Moore to act in violation of her lawful duty, including the following:

    a.     During WOODS's management of the BPAs, various concerns arose regarding Company A's and WOODS's performance of the BPAs. For example, certain contractors often arrived late to trainings, ended trainings too early, or failed to appear for trainings

8

altogether. Moore never reported any of those complaints to her supervisor, as she was required to do, and instead alerted WOODS.

b.      It was part of Moore's official duties to perform yearly reviews of Company A's performance under the BPAs. DCHR relied on Moore's reviews in determining whether to exercise its yearly option to extend the BPAs with Company A. Despite knowing about various concerns regarding Company A's and WOODS's performance under the BPAs, Moore nonetheless provided Company A with reviews of "EXCELLENT," which ensured that DCHR renewed its BPAs with Company A and protected WOODS's ability to earn money under the BPAs.

c.      During WOODS's management of the BPAs, WOODS often received advance payments from DCHR before submitting invoices for work performed. Some of those advance payments were approximately $100,000. Moore would inform WOODS in August or September of each year regarding how much unspent money remained in DCHR's yearly budget, so that WOODS could anticipate how much of an advanced payment to expect. Moore would then authorize the advanced payments to Company A as part of her official duties. Moore would not alert other contractors regarding how much unspent money remained in DCHR's annual budget.

d.      At WOODS' request, Moore advised other D.C. Government officials, including personnel at the Office of Finance and Resource Management, to expedite the payment of WOODS' invoices.

e.      From on or about March 24, 2015, through on or about June 21, 2017, as described above, WOODS usurped the BPAs and submitted fraudulent invoices to Moore for payment, misrepresenting that Company A was actually submitting those invoices. Even though the fraudulent invoices appeared materially different from Company A's previous invoices, Moore

9

did not inquire why those invoices suddenly appeared different, nor did Moore raise her concerns regarding those invoices to her supervisor. Rather, Moore accepted those invoices, approved them for payment, and then forwarded them to other D.C. Government officials to approve and process for payment.

        f.     In or around late 2016 or early 2017, a HR consultant ("Person 2") that performed work under the BPAs informed Moore that Person 2 received a paycheck from WOODS written from the CTM Account. Moore knew that WOODS owned CTM and believed that it was improper for WOODS to pay a contractor from the CTM Account. Upon learning that WOODS paid Person 2 from the CTM Account, Moore suspected that something nefarious was occurring regarding WOODS's management of the BPAs and that WOODS may have been performing the BPAs without Company A's knowledge or approval. Despite having those concerns, Moore remained silent and never informed her supervisor regarding this incident involving Person 2, nor her concern that WOODS was potentially performing the BPAs without Company A's knowledge.

        g.     In or around 2017, Company A discovered that WOODS was performing the BPAs without Company A's knowledge and approval and was retaining the profits for himself. Company A filed a Freedom of Information Act ("FOIA") request with the D.C. Government on or about September 22, 2017, seeking, among other things, records of all payments made by the D.C. Government to Company A from January 2015 to September 2017. DCHR tasked Moore with compiling a response to Company A's FOIA request. Despite working on this request, Moore remained silent and did not notify her supervisors regarding her suspicions that WOODS was performing work under the BPAs without Company A's knowledge.

        All in violation of Title 18, United States Code, Section 201(b)(1).

**COUNTS NINE AND TEN**
**(Engaging in Monetary Transactions in Property Derived**
**from Specified Unlawful Activity – 18 U.S.C. § 1957)**

28.     The allegations set forth in paragraphs 1 through 19 of this Indictment are re-alleged and incorporated by reference.

29.     On or about the dates listed below, in the District of Columbia and elsewhere, the defendant, JOHN WOODS, did knowingly engage and attempt to engage in the monetary transactions listed below by, through, and to a financial institution, and affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the scheme to defraud set forth in Counts One through Seven above:

| Count: | On or About Date: | Description: |
|---|---|---|
| **Nine** | August 17, 2015 | One check for $111,293 made payable to Company A, which was deposited into the CTM Account. |
| **Ten** | October 19, 2015 | One check for $125,000 made payable to Company A, which was deposited into the CTM Account. |

All in violation of Title 18, United States Code, Section 1957.

**CRIMINAL FORFEITURE ALLEGATION**

1.     Upon conviction of the offense alleged in Counts One through Ten of this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to those offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(A), (C), and (D), and Title 28, United States Code, Section 2461(c). The United States will also seek a forfeiture money judgment against the defendant equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to this offense.

11

2.    If any of the property described above as being subject to forfeiture, as a result of

any act or omission of the defendant:

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

      c.   has been placed beyond the jurisdiction of the Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property that cannot be divided without

         difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value

of the property described above, pursuant to Title 21, United States Code, Section 853(p)

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(A),(C), and (D), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p)).**

A TRUE BILL

FOREPERSON

*Jessic K. Liv/jik*

ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA

12